JUDGE PRESKA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

RBM HOLDINGS LLC,

                    Plaintiff,

      - against -

AEGEAN MARINE PETROLEUM
NETWORK, INC., GEORGE KONOMOS,
YANNIS PAPANICOLAOU, SPYRIDON
FOKAS, and KONSTANTINOS
KOUTSOMITOPOULOS,

                    Defendants.

------------------------------------------------ x

## 18 CV 2085

18 Civ. _____ (

**COMPLAINT**

**JURY DEMANDED**

Plaintiff RBM Holdings LLC (the "Plaintiff" or "RBM"), for its Complaint against

Defendants Aegean Marine Petroleum Network, Inc. ("Aegean Marine" or "Company"), George

Konomos, Yannis Papanicolaou, Spyridon Fokas, and Konstantinos Koutsomitopoulos

(collectively, the "Defendant Directors" or the "Board," and together with Aegean Marine, the

"Defendants"), respectfully alleges as follows:

### NATURE OF THE ACTION

1.      This is an action to enjoin a corrupt transaction that was approved by conflicted

directors and structured for the benefit of insiders at the expense of the Plaintiff and other

minority shareholders. The proposed transaction would effectively block the slate of directors

submitted by a group of concerned shareholders, including the Plaintiff's members, for

consideration at an upcoming annual election. It would do so by massively diluting and

disenfranchising current shareholders, including RBM, and lining the pockets of Aegean

Marine's controlling founder, Dimitris Melissanidis. The proposed transaction is so violative of

1

shareholder trust and rights, so destructive of shareholder value, and so plainly designed to oppress RBM, that Stifel, a leading investment advisory firm, has said "*it is hard to even fathom how any transaction could possibly be worse.*" [Ex. A, Stifel, Company Update: Aegean Marine Petroleum Network, Inc.]

2.     The transaction at the heart of this action is a proposed acquisition by Aegean Marine of H.E.C. Europe Limited ("HEC"), a closely-related company owned by Melissanidis and his family (the "Acquisition"). The Acquisition would be just the latest in a history of interested corporate actions, sanctioned by a conflicted Board, that benefit them and Aegean Marine's founder at the expense of shareholders.

3.     The Defendants timed and structured the Acquisition to thwart the Plaintiff's rights as an Aegean Marine shareholder to nominate and vote on a slate of independent directors. In January 2018, a group of Aegean Marine shareholders, including the members of RBM, formed the Committee for Aegean Accountability (the "Committee") and nominated a slate of directors for election to open seats on Aegean Marine's Board of Directors at the 2018 shareholders' meeting.

4.     Beyond timing, there is no rational explanation or justification for why the Defendants chose to pursue the Acquisition on its current terms at all. The Acquisition will not only effectively strip away the franchise and RBM's nomination rights just before an impending election—it will siphon away much of the value of its equity stake in Aegean Marine and funnel the spoils to Melissanidis. The Acquisition involves Aegean Marine paying $367 million to purchase all of the share capital of HEC. This purchase price values HEC at a whopping multiple of 24 times 2017 EBITDA, for a microcap waste disposal company controlled and owned by Aegean Marine's founder. A normal multiple for similar businesses would be four to eight times

trailing EBITDA. This means the Defendant Directors knowingly approved a deal that requires Aegean Marine (and its shareholders) to overpay by at least 300% for HEC, a company that at most realistically is worth $125 million.

5.      Compounding the destruction of shareholder value here is the fact that a significant chunk of the consideration for HEC is payable in newly-issued shares of Aegean Marine. If the Acquisition closes, 20 million new shares of Aegean Marine will be issued and granted to Melissanidis and his family. This will dilute existing shareholders by 33%. When combined with the shares of other Melissanidis-aligned holders, including former chairman Peter Georgiopoulous, the Melissanidis group will effectively have the power to block all future Board elections.

6.      Additionally, this stock issuance comes at a time when shares of Aegean Marine are severely depressed, trading near all-time lows, at a price roughly 25% of current liquidation value. Notwithstanding the company's low share price, the Defendant Directors have chosen to attempt to massively dilute RBM and other minority shareholders in order to vest effective control of the Company in Melissanidis's hands.

7.      The egregious terms of the Acquisition have not gone unnoticed by the investing public and independent third parties. Aegean Marine's stock price has dropped approximately 50% since the announcement. As Stifel pointed out in a recent investor note, the Acquisition "checks all the boxes" for questionable deals: the Defendants are "issuing equity at the worst possible time . . . to the one person in the world the company should most avoid dealing with, [will] be paying at least 300% more than even a *conservative* fair value, and the list could go on."

3

8.      Stifel likewise criticized the transaction's timing in relation to the shareholder vote, noting that the slate of directors nominated by the Committee is "of the highest quality and experience," and "the only reason [the Defendants have] for not accepting these board members and putting forward a separate group, including Mr. Melissanidis's son, would be to protect some questionable dealings."

9.      The primary purpose of the Acquisition is obvious: to entrench and insulate the current directors, stack the Board with additional friendly directors, and stymie the pending proxy challenge. Defendants have also structured the Acquisition to transfer value away from the company and into Melissanidis's coffers. In approving such a dilutive, oppressive, and value-destructive deal, the Director Defendants acted in the interest of Melissanidis and themselves, while ignoring the franchise rights and financial interests of RBM.

10.     Accordingly, for the reasons described herein, the Plaintiff requests that the Court enter an order declaring that the Acquisition is unlawful and invalid by reason of the Defendant Directors' breaches of fiduciary duty, and enjoining all Defendants from taking steps to finalize the Acquisition.

**PARTIES**

11.     RBM is a limited liability company that was formed in March 2018 by three shareholders of Aegean Marine: Tyler Baron, Justin Moore, and August Roth (the "RBM Members"). RBM Members transferred control of Aegean Marine shares to RBM, which is a significant shareholder of Aegean Marine. The individual RBM Members have each sought to influence Aegean Marine to improve its governance, oversight, and financial performance. The RBM Members have been shareholders of Aegean Marine at all times relevant to this action.

4

12.     RBM's managing member, Baron, is the co-founder of Sentinel Rock Capital, LLC, an investment manager based in California focused on small and mid-capitalization equities and debt. Baron has taken an active interest in improving Aegean Marine since first investing in the company in 2014.

13.     August Roth is a member of RBM. He is an investor based in California.

14.     Justin Moore is a member of RBM. He is a successful entrepreneur and investor. Moore resides in California.

15.     Aegean Marine is a publicly-traded Company incorporated in the Marshall Islands. Aegean Marine is headquartered in Greece and maintains a significant office in New York. Aegean Marine's shares trade on the New York Stock Exchange under the ticker symbol ANW.

16.     Aegean Marine was founded by Melissanidis in 1995 and is in the business of marketing and supplying marine fuel and related supplies to ships internationally. Aegean Marine has a long history of questionable related-party transactions at off-market terms with other entities owned or controlled by Melissanidis and his family.

17.     Defendant Konomos is a director of Aegean Marine. He resides in Manhattan and operates out of Aegean Marine's Park Avenue offices, where he has his own individual office.

18.     Defendant Papanicolaou is Chairman of the Board of Aegean Marine.  On information and belief he is a resident of Greece.

19.     Defendant Fokas is a director of Aegean Marine and its General Counsel.  On information and belief he is a resident of Greece.

20.     Defendant Koutsomitopoulos is a director of Aegean Marine.  On information and belief he is a resident of Greece.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28

U.S.C. § 1332(a)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum

of $75,000, and there is complete diversity between the Plaintiff (and all of its members) and

Defendants. This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.  This action is further brought pursuant to the

federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (b) and (d).

Substantial acts in furtherance of and related to the alleged breaches of fiduciary duty occurred

within this district. These acts included numerous communications with the investing public

(including the issuance of all press releases) from New York, the retention of New York legal

counsel and financial advisors regarding the Acquisition, meetings and telephone calls in New

York among the Directors and officers regarding the transaction, and communications between

investors and the Director Defendants in New York related to the Acquisition, as well as

extensive travel by the Defendant Directors to New York for meetings.

23.     In addition, venue is proper in this District because Aegean Marine maintains an

office at 299 Park Avenue in Manhattan; Defendant Konomos resides in this district and operates

out of Aegean Marine's New York office; and a number of Aegean Marine's senior officers are

located in New York, including Chief Operating Officer, Manolis Chochlakis, Senior Vice

President of Investor Relations and Business Strategy, Justin Yagerman, Head of Global Supply,

Cargo, and Product, Salvatore Drago, and Director of Strategic Development Gregg Schwartz.

24.     Moreover, Aegean Marine's New York office serves as the public face of the

Company. Aegean Marine's 2016 20-F identifies 299 Park Avenue as Aegean Marine's

"executive office," overseeing "financial and other reporting functions." Aegean Marine's global

hedging is conducted in New York, as is the majority of its global fuel sourcing. The Board of

Directors often holds its quarterly meetings in New York. The annual shareholder meeting takes

place in New York as well. Aegean Marine's most recent Investor Day presentation, held on

March 8, 2017, was in New York, and half of the officers presenting to the public were based in

New York.

## **RELEVANT FACTS**

### **Aegean Marine and Its Founder, Dimitris Melissanidis**

25.     Melissanidis is the founder of Aegean Marine and one of Greece's most powerful

men. In addition to founding Aegean Marine, he owns several other energy- and shipping-related

businesses, as part of the Aegean Group umbrella organization.

26.     Melissanidis has a checkered past dating back to the 1970s, having been

investigated, charged, and convicted of numerous crimes and implicated in many more, including

bribery, tax avoidance, assault, and death threats.  According to Aegean Marine's 2007

Registration Statement, in 1999 and 2000, Melissanidis was charged for felony crimes, including

"false certifications, forgery, use of forged documents, and trafficking in contraband," in

connection with sham vessel refueling operations. Trial courts convicted him of misdemeanors in

two separate cases for similar activities. Administrative actions were brought against

Melissanidis for the collection of taxes and customs due in connection with these cases. In 1999,

Melissanidis was charged and convicted for violating a government order. And in 2000, a trade

union brought a criminal action against Melissanidis for slander and threats of violence.

27.     More recently, Melissanidis has been accused of other illegal conduct. In 2013,

Melissanidis allegedly threatened the chief executive of a Greek gambling company, threatening

to "take [his] head off." Separately, Melissanidis reportedly threatened to kill a reporter and his family. That same year, the Customs Authority investigated Melissanidis for fuel smuggling. In 2014, Melissanidis was summoned by authorities to answer questions regarding allegations that he ordered an attack on a soccer referee.

28.     In 2017, several of Melissanidis's Aegean entities were implicated in a scheme involving shipping companies paying bribes to Brazil's state-owned oil company, Petrobras.

29.     As recently as August 2016, Melissanidis served as Aegean Marine's Head of Corporate Development and owned approximately 22% of Aegean Marine shares. At that time, Aegean Marine's Board of Directors approved a transaction to repurchase Melissanidis's interest for $8.81 per share or approximately $100 million. Simultaneously, Aegean Marine insiders, including its General Counsel and Chief Financial Officer, sold $1 million of stock—the only time they have done so.

30.     Though Aegean Marine represented to investors that the share buyback would not cause the Company to breach any contractual agreements or covenants, the transaction in fact caused the Company to violate the terms of its line of credit, resulting in substantial liquidity issues. The Board cured the violation by borrowing $20 million from a Melissanidis-controlled company, Grady Properties Corporation SA.

31.     Though Melissanidis ostensibly stepped down as Head of Corporate Development after the August 2016 transaction and no longer held a direct ownership stake in Aegean Marine, he continues to exert control over the Company in a number of ways.

32.     As recently as 2017, he was listed on the Aegean Marine organizational chart as a "Corporate Consultant" at the same level as then-President and CEO, Nikolas Tavlarios. Upon

information and belief, he has retained the authority to terminate employees and has exercised this authority.

33.     Aegean Marine and a number of Melissanidis-owned companies, including HEC, operate out of the same building in Greece, which is owned by Melissanidis.  Melissanidis's personal office is located next to those of Aegean Marine's General Counsel and its Chief Financial Officer. On information and belief, Aegean Marine employees in Greece also work for Melissanidis's other companies, though their salaries are paid by Aegean Marine.

34.     Even after the August 2016 transaction, Melissanidis continued to view Aegean Marine as an entity under his control. The Autumn 2017 issue of Aegean News, a magazine published by Melissanidis and focused on the Melissanidis business empire, continues to list Aegean Marine under the Melissanidis umbrella. Seven Aegean Marine employees were profiled in the same issue, and Aegean Marine was listed as "one of the most dynamically developing divisions of the Aegean Group." As recently as January 2018, the Aegean Oil website included a subheading dedicated to Aegean Marine's operations.

35.     The members of Aegean Marine's Board of Directors are closely allied with Melissanidis and all are beholden to him for their positions. Upon information and belief, Melissanidis personally appointed three of Aegean Marine's four Board members, all of whom are defendants in this action.

36.     The Defendant Directors are all beneficiaries of corporate largesse courtesy of Melissanidis and Aegean Marine. In 2016, the last reported date, Aegean Marine paid its non-executive directors $300,000 in cash. Importantly, the Defendant Directors appear to own little or no Aegean Marine stock. The Defendant Directors also travel with Melissanidis: Defendant

Director Fokas, Aegean Marine's General Counsel, traveled with Melissanidis on his trip to the White House in 2017.

37.     Melissanidis has also funneled cash to Aegean Marine's directors and officers in various ways. Fokas was appointed first deputy chairman of OPAP, a Greek gambling monopoly owned by Melissanidis. Fokas also maintains a private law practice which is paid by Aegean Marine and, on information and belief, other Melissanidis entities. Spyros Gianniotis, Aegean Marine's CFO, has been engaged in the financings of Melissanidis's non-affiliated companies. The other Aegean Marine Directors have similarly cozy, symbiotic relationships with Melissanidis and his various entities.

38.     Given his close ties to the Board, it is not surprising that Melissanidis has also benefitted from a series of related-party transactions between Aegean Marine and Melissanidis-controlled entities, including the following:

- The $100 million repurchase of Melissanidis's shares in 2016.

- In October 2016, Aegean Marine took out a $20 million bridge loan from a Melissanidis-owned company, Grady Properties Corporation SA, following the liquidity crisis prompted by the $100 million repurchase of Melissanidis's shares.

- In April 2005, Aegean Marine entered into an agreement with a Melissanidis-owned company, Aegean Oil, requiring Aegean Marine to purchase fuel exclusively from Aegean Oil in Greece. Although Aegean Marine has an extensive fleet of vessels in Greece, the Company contracts with Aegean Oil as an exclusive intermediary at above-market transfer pricing, benefitting Aegean Oil at the expense of Aegean Marine.

- Melissanidis saddled the company with an oil terminal project in Fujairah, requiring the company to spend $205 million in construction and related costs associated with the terminal.

- HEC charters four vessels annually from Aegean Marine for a total amount of $100,000 (or $25,000 per vessel), well below market rates.

**The RBM Members Try to Address Their Corporate Governance
and Performance Concerns with Aegean Marine's Board and Management**

39.     Throughout 2017, the RBM Members and other investors pursued a dialogue with Aegean Marine's management and Board about improving governance, transparency, Board independence, and financial performance.

40.     On April 25, 2017, RBM Managing Member Baron sent a letter to then-Chairman Peter Georgiopoulos that, among other things, highlighted deficiencies in the Company's financing structure and corporate governance and suggested changes to the composition of the Board.

41.     On October 10, 2017, Baron sent a letter to Board Interim-Chairman Papanicolaou and Director Koutsomitopoulos, outlining his concerns about vacancies on the Board, and recommending candidates to fill those vacancies.

42.     On November 3, 2017, Koutsomitopoulos wrote an e-mail to Baron, stating that Jonathan Mcilroy, Aegean Marine's President, and Yagerman, Aegean Marine's Senior Vice President of Investor Relations, would be available to meet with investors in mid-November in New York. Baron met with Mcilroy and Yagerman on November 16, 2017, and separately with Defendants Koutsomitopoulos and Konomos that same day. During those meetings, Baron expressed his displeasure with the Board's performance and oversight, and offered suggestions on how to improve Aegean Marine's governance and performance. The directors and officers were unreceptive.

43.     The RBM Members continued to press their concerns throughout November and December 2017. On November 20 and November 29, Justin Moore sent emails to the Board expressing concern about governance issues. In a letter dated December 4, Papanicolaou

dismissed Moore's concerns, stating that the Board is "more than sufficient to properly guide the Company."

44.     On November 27, 2017, Baron sent a letter to the Board reiterating his concern about Aegean Marine's governance and the history of suspect transactions approved by the Board. In the November 27 letter, Baron presented possible paths forward if the Board continued to refuse to engage with shareholders, including nominating a slate of directors to serve on Aegean Marine's Board. That same day, Baron also spoke with Director Konomos. During that conversation, Konomos expressed his concern that Melissanidis might engineer a purchase of another Melissanidis-owned company by Aegean Marine in order to regain Aegean Marine voting stock and ensure that no independent directors would be appointed.

45.     On December 20, 2017, the Committee sent a letter to the Board addressing problems with Board membership, independence and accountability, troubling related-party transactions, and Melissanidis's inappropriate, ongoing control over Aegean Marine. Again, Baron raised the possibility of nominating independent directors for election to the Board.

**The Committee for Aegean Accountability Nominates Independent Directors**

46.     Stalled in their reform efforts, and with Aegean Marine's Board consisting of Melissanidis's cronies, the RBM Members determined that further attempts to amicably seek changes in governance would be futile.

47.     Consequently, in December 2017, the RBM Members and other concerned shareholders formed the Committee. The Committee was created to put forward a proxy challenge to place competent, independent directors on the Board of Aegean Marine.

48.    On January 31, 2018, the RBM Members and the other members of the Committee announced a slate of highly qualified candidates for election to the Board of Directors at the 2018 annual shareholder meeting.

49.    Shortly thereafter, Baron spoke with Konomos and inquired about the Board's response to the proxy announcement. During that conversation, Konomos told Baron that the Board had retained New York law firm Kramer Levin Naftalis & Frankel LLP for the purpose of engaging with the Committee, and the Board would respond to the Committee upon its counsel's recommendation. The Board did not substantively respond to the Committee's January 31 announcement.

50.    On February 19, 2018, the Committee issued a press release that criticized the Board's refusal to engage in good faith and that warned against engaging in a transaction to "dilute shareholder influence."

**Aegean Marine Announces a Dilutive and Self-Dealing
Acquisition Designed to Disenfranchise Shareholders**

51.    On February 20, Aegean Marine issued a press release announcing that it had entered into an agreement to acquire 100% of the share capital of HEC, a small, marine waste processing company owned and controlled by Melissanidis.

52.    The terms of the Acquisition defy logic. The purchase price for HEC approved by the Board was approximately $367 million and is to be funded with a combination of cash equivalents, debt, and most importantly, the issuance of 20 million new shares of Aegean Marine stock. The stock issuance will massively dilute existing shareholders (reducing their ownership by one-third) and return financial and voting control of more than 33% of Aegean Marine's stock to Melissanidis.

53.     Pursuant to the sale agreement, upon closing the Acquisition, Melissanidis will place his son George and two others appointed by him on Aegean Marine's Board.  The agreement also provides that, going forward, Melissanidis and his group will vote their shares in accordance with the recommendation of the Board regarding the future appointment and removal of directors.

54.     The press release stated that a Special Committee of independent directors had recommended the Acquisition, which the Board approved unanimously.

55.     The following day, Aegean Marine hosted a conference call to discuss the HEC Acquisition. Mcilroy, Yagerman, and Gianniotis were present on the call. In conjunction with the call, Aegean Marine provided an investor presentation, which it made available on its website (www.ampni.com).

56.     According to Aegean Marine, the Acquisition is scheduled to close in the second quarter of 2018, possibly in April.

57.     The terms and timing of the Acquisition appear designed to (1) entrench existing directors, (2) oppress and disenfranchise shareholders, (3) eliminate the challenge of the Committee's slate, and (4) enrich insiders.

58.     The timing is significant. Although Aegean Marine has not yet scheduled its 2018 annual meeting of shareholders, the Aegean Marine annual meeting typically takes place in June. This is relevant because Aegean Marine has stated that the HEC transaction will close in the second quarter, likely in April. If the Acquisition closes before the annual shareholder meeting, there will be four additional Melissanidis loyalists on the Board.

59.     Moreover, if the acquisition closes before the annual meeting, as expected, absent judicial intervention this will dilute the voting stock of Plaintiff and other shareholders by 33%.

The corresponding grant of 33% of the voting stock to Melissanidis would occur *before* the election of directors at the annual shareholder meeting.

60.    By diluting the voting shares of the Plaintiff by 33%, while giving one-third of the post-Acquisition voting power to Melissanidis, the Defendant Directors have virtually ensured that the Committee's competing slate of directors will not get elected.

61.    Between Melissanidis and other insiders, including certain of the Defendant Directors, Melissanidis and his allies will control nearly 50% of the voting stock of Aegean Marine if the Acquisition is closed. With this much voting power in their hands, the election of directors at the upcoming annual shareholder meeting will be a mere formality. Entrenchment will be a given.

62.    Because the Acquisition will so severely dilute the voting power of the Plaintiff and other shareholder-members of the Committee, the nominating and franchise rights of the Plaintiff will be effectively nullified at this year's election and in all future elections. Melissanidis—already the controlling force behind the Board—will become its *de facto* controlling shareholder.

63.    The press release and investor presentation describing the Acquisition contained a number of dubious representations. For example, Aegean Marine projects that HEC's 2018 EBITDA will be $35 to 40 million but discloses in tiny print at the bottom of the page that this figure is "[s]ubject to . . . the completion of [unnamed] acquisitions in 2018." Thus, the data point underpinning Aegean Marine's valuation of HEC is premised on the closing of future accretive acquisitions, but the presentation gave no estimate of HEC's 2018 EBITDA without the hypothetical deals. The company's estimates also apparently fail to account for the cost of these purported HEC future accretive transactions.

64.     More interesting than what the Acquisition disclosures say is what they do not say. Neither the press release nor the investor presentation discusses the process the Board took in deciding to pursue an acquisition at this time. The press release and investor presentation do not disclose many of the things one would ordinarily see in discussions of proposed corporate transactions, such as:

- whether the Company discussed a potential acquisition with companies other than HEC;

- any discussion of a review of comparable transactions in determining an acquisition price; and

- how fairness opinions were arrived at.

65.     Neither the press release nor the investor presentation disclose the conflicts inherent in the HEC Acquisition.  Specifically, they do not disclose that Melissanidis still exerts control over Aegean Marine and its Board, and therefore effectively stands on both sides of this transaction.

66.     The press release and investor presentation likewise do not disclose potential conflicts of the Company's and Special Committee's advisors.  Clarksons Platou, the financial advisor retained by the Special Committee, acted as manager for Aegean Marine in a significant debt transaction as recently as 2016, and even featured that transaction in its 2016 Annual Report.  Jefferies, the financial advisor retained by Aegean Marine, has repeatedly acted as a banker to the Company.

67.     Indeed, the press release and presentation do not disclose that HEC and Aegean Marine operate out of the same Melissanidis-owned building. The Company did, however, expressly disclose that it would not seek shareholder approval for the acquisition.

16

68.     The glaring omissions in Aegean Marine's disclosures are not surprising. By any rational metric, the Acquisition's $367 million price drastically overvalues HEC. Aegean Marine has agreed to pay approximately 24 times HEC's 2017 EBITDA—exponentially more than the EBITDA multiples standard for small businesses like HEC in this market.

69.     In response to concerns about the high valuation, Aegean Marine has claimed the Acquisition price is based on HEC's projected 2018 EBITDA. Yet even this assumes two highly unlikely events: (i) that HEC EBITDA *more than doubles* from 2017 to 2018, and (ii) that HEC completes the multiple unspecified acquisitions that have not yet closed. Even if HEC meets these hopeful projections, the Acquisition price still would represent a multiple of approximately 10x forward EBITDA, over twice the industry standard, and that assumes that the total transaction costs are $0.

70.     The HEC deal would destroy enormous shareholder value if it closes. Possibly worse than the grossly inflated valuation ascribed to HEC, though, was the Board's approval of using Aegean Marine stock as currency at a time when the stock was trading near its all-time low. Indeed, Mcilroy had previously agreed that the equity markets were "off limits" to Aegean Marine given the historically low share price.

71.     The Board has decided to issue 20 million new shares of stock priced at $4.45 per share (now $2.30 per share), just 18 months after Aegean Marine bought back 11 million shares from Melissanidis at $8.81 per share. Neither the Company nor the Board have explained how it was a prudent capital allocation decision to buy back shares from Melissanidis at one price and then issue twice as many new shares to him at half the price. Nor has the Board explained why the shares were undervalued at $8.81 yet overvalued at $4.45 the following winter. The Board likewise failed to explain or disclose why it granted HEC and Melissanidis the right to appoint

17

three Board members as part of the Acquisition. The purpose, however, is transparent—to consolidate control of the Board among its incumbent members and other Melissanidis allies.

**The Market Reacts to the HEC Transaction**

72. The Defendant Directors approved a transaction that was dilutive, uneconomic, and destructive of the shareholder franchise. They acted out of a desire to entrench themselves and to avoid being replaced with independent directors who would ferret out the numerous inappropriate transactions that have taken place on this Board's watch.

73. The markets and investors reacted to the HEC Acquisition quickly and violently. Since the announcement, Aegean Marine's stock price has plummeted to $2.30, an almost 50% drop since the announcement, down from a high of $13 in the past year.

74. One analyst at Stifel summed up the market's reaction to the transaction:

> In our experience of covering shipping we have seen our share of questionable deals, but this one takes the cake, in our view, and there is not a close second. We see so many violations of shareholder trust in Aegean's decision to buy [HEC] it is hard to even fathom how any transaction could possibly be worse.
>
> [Ex. A, Stifel, Company Update: Aegean Marine Petroleum Network, Inc.]

The Stifel report adds that "[b]y giving the founder 20 million shares, we believe it enables the company to appoint 'friendly' board members who would not rock the boat and allow shady related-party transactions to continue at expense of public shareholders."

75. Since the HEC Acquisition was announced, numerous shareholders have reached out to the RBM Members to express their outrage and dismay at Aegean Marine's bald attempt to disenfranchise its shareholders and effectively extinguish a contested election.

**Recent Communications with Aegean**

76.     Perhaps recognizing the impropriety of the transaction, on February 26, 2018, Director Konomos met with Baron in New York. Konomos acknowledged that the transaction would be a problem for current shareholders, stating frankly that, if the transaction closes, *"You'll be f\*\*k\*d."*

77.     In a discussion after the February 26 meeting, Konomos told Baron that he was traveling to Greece to discuss the concerns about the transaction with the Board.

78.     Konomos has continued to communicate with Baron as recently as the week of March 5, 2018.  The Board's apparent intention is to run out the clock and close the transaction as soon as possible. Consequently, this litigation has been commenced.

79.     On March 7, the Company issued a press release announcing its earnings for the fourth quarter of 2017. In that press release, the Company also announced that it was cutting its dividend in half, stating that it was necessary to preserve capital. Obviously, the existence of a critical need to preserve capital is wholly inconsistent with the decision to pursue a $367 million acquisition at this time.

**COUNT I**
**(Declaratory Judgment that the Acquisition is Invalid**
**Due to the Defendant Directors' Breach of Fiduciary Duty)**

80.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 as if fully set forth herein.

81.     There is an actual controversy, within the meaning of 28 U.S.C. § 2201.

82.     The Defendant Directors owed and continue to owe fiduciary duties to the Plaintiff. Due to their positions as fiduciaries, Defendant Directors specifically owed the Plaintiff the highest duties of care, fair dealing, good faith, and loyalty.

83.     Among other things, the Defendant Directors had a duty to evaluate, initiate, structure, and time the Acquisition in a non-conflicted manner and without unfair dealing. The Defendant Directors had a duty not to approve the Acquisition in order to entrench themselves on Aegean Marine's Board or to impede Plaintiff's right to nominate and vote for qualified directors. The Defendant Directors also had a duty to obtain a fair price.

84.     The Director Defendants violated these duties.

85.     The Board approved the Acquisition despite it being massively dilutive to the voting and economic interests of the Plaintiff, directly and irreparably harmful to the Plaintiff's voting and nominating rights, uneconomic, and self-interested.

86.     The Board did not engage in fair dealing in connection with the Acquisition. The Board did not obtain a fair price for the Acquisition.

87.     There is no compelling justification to close the Acquisition.

88.     Defendant Directors, individually and collectively, violated and breached their duties of care, good faith, and loyalty.

89.     In light of the Defendant Directors' breach of fiduciary duties, the Plaintiff is entitled to a declaration from this Court that the Acquisition was unlawfully approved and is therefore invalid.

## COUNT II
### (Preliminary and Permanent Injunctive Relief
### Barring All Defendants from Closing the Acquisition)

90.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 as if fully set forth herein.

91.     The Board owed and continues to owe fiduciary duties to Aegean Marine and to all its shareholders. Due to their positions as fiduciaries, the Defendant Directors owed Aegean

Marine and its shareholders, including the Plaintiff, the highest duties of care, fair dealing, good faith, and loyalty.

92.     Among other things, the Defendant Directors had a duty to evaluate, initiate, structure, and time the Acquisition in a non-conflicted manner and without unfair dealing. The Defendant Directors had a duty not to approve the Acquisition in order to entrench themselves on Aegean Marine's Board or to impede Plaintiff's right to nominate and vote for qualified directors. The Defendant Directors also had a duty to obtain a fair price.

93.     The Defendant Directors violated these duties.

94.     The Board approved a dilutive, uneconomic, and self-interested transaction, did not engage in fair dealing in connection with the Acquisition, and did not obtain or try to obtain a fair price for the Acquisition.

95.     There is no compelling justification to close the Acquisition.

96.     Defendant Directors, individually and collectively, violated and breached their duties of care, good faith, and loyalty.

97.     Plaintiff will be irreparably harmed if Defendants are permitted to proceed with the Acquisition because its shareholder voting and nomination rights will be permanently impaired, its proxy challenge at the 2018 annual election will be unlawfully nullified, its shares will be diluted, and the value of its stake in Aegean Marine will be diminished.

98.     Given the unfair terms of the Acquisition, Plaintiff is highly likely to prevail on the merits.

99.     The public interest weighs in favor of granting injunctive relief based on the interest in preserving the rights of investors and having corporate fiduciaries act in the best interests of shareholders and their companies.

21

100.    Because Plaintiff has no adequate remedy at law, it is entitled to injunctive relief, preliminarily and permanently enjoining the Defendants and all of their agents, affiliates, and subsidiaries from consummating the Acquisition.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, individually and on behalf of Aegean Marine, requests the following relief in conjunction with the allegations and counts set forth above:

A.     Entry of an Order declaring the Acquisition to be unlawful and invalid;

B.     Entry of an Order preliminarily enjoining the Acquisition;

C.     Entry of an Order permanently enjoining the Acquisition; and

D.     Entry of an Order awarding to the Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.     Entry of an Order granting such further equitable or other relief as the court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues presented in this complaint.

Dated: March 8, 2018

Douglas A. Rappaport
Robert J. Boller
Richard R. Williams, Jr.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
darappaport@akingump.com
rboller@akingump.com
williamsr@akingump.com
*Counsel for Plaintiff*

22